UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

SHAWN HICKS                                       CIVIL ACTION NO. 6:17-cv-00942

VERSUS                                            JUDGE JAMES

NANCY A. BERRYHILL, ACTING                        MAGISTRATE JUDGE HANNA
COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION

## REPORT  AND  RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability.

Considering the administrative record, the briefs of the parties, and the applicable

law, it is recommended that the Commissioner's decision be reversed and remanded

for further administrative action.

## Administrative Proceedings

The claimant, Shawn B. Hicks, fully exhausted his administrative remedies

before filing this action in federal court.  He filed an application for disability

insurance benefits ("DIB"), alleging disability beginning on January 8, 2014[1] due to

a back injury, depression, and anxiety.[2]  His application was denied.[3]  He then

---

[1]      Rec. Doc. 12-1 at 137.

[2]      Rec. Doc. 12-1 at 72.

[3]      Rec. Doc. 12-1 at 71.

requested a hearing, which was held on February 18, 2016 before Administrative Law Judge Thomas J. Henderson.[4]  The ALJ issued a decision on March 8, 2016, concluding that the claimant was not disabled within the meaning of the Social Security Act from January 8, 2014 through the date of the decision.[5]  The claimant asked the Appeals Council to review the decision, but no basis for review was found.[6]  The ALJ's decision thus became the final decision of the Commissioner for the purpose of the Court's review pursuant to 42 U.S.C. § 405(g).  The claimant then filed this action seeking review of the Commissioner's decision.

### Summary of Pertinent Facts

The claimant was born on January 5, 1969.[7]  At the time of the ALJ's decision, he was forty-seven years old.  He graduated from high school and attended college for two years without obtaining a degree.[8]  He has relevant work experience as a shift supervisor in a powder coatings manufacturing facility, as an assistant supervisor in a food processing plant, and as a finishing manager in an aluminum

---

[4]     A transcript of the hearing is found in the record at Rec. Doc. 12-1 at 52-70.

[5]     Rec. Doc. 12-1 at 30-40.

[6]     Rec. Doc. 12-1 at 5.

[7]     Rec. Doc. 12-1 at 72.

[8]     Rec. Doc. 12-1 at 55, 151.

extrusion plant.[9]  He alleged that he has been disabled since January 2014 due to a back injury, depression, and anxiety.[10]

On January 17, 2012,[11] the claimant saw his primary care physician, family medicine practitioner Dr. Calvin White, in follow up with regard to depression and bilateral hip pain.  He gave a history of having had gastric bypass surgery in 2001 and right hip surgery in 1998.  He was described as an alcoholic and reportedly drank six to seven beers per day.  He appeared to be in pain, his gait was slow and antalgic, he had mild tenderness upon palpation of his lumbar area, and he had a limited range of motion in both hips as well as mild crepitation in his right knee.  He complained of low back pain, numbness and tingling in his left arm and hand, and tremors in his hands.  He was anxious, depressed, and stressed.  He complained of memory loss, suicidal ideation, and withdrawn behavior.  His problems were listed as depression, anxiety syndrome, insomnia, hip pain, essential/familial tremor, and Vitamin D deficiency.  He was prescribed Alprazolam for anxiety and Hydrocodone-Acetaminophen for pain.  He was already taking Pristiq for depression.

---

[9]      Rec. Doc. 12-1 at 151, 163.

[10]     Rec. Doc. 12-1 at 72.

[11]     Rec. Doc. 12-1 at 237-240.

On February 10, 2012, Mr. Hicks visited Dr. David Clause at Opelousas Orthopaedic Clinic,[12] complaining of pain at the groin area of both hips, worse on the right than the left.  Dr. Clause did not observe a limp.  The claimant's pulses were intact, there were no motor or sensory deficits distally, and he did not have positive straight-leg raise tests while seated or supine.  X-rays showed no evidence of arthritic changes or stress fractures.  Dr. Clause opined that the pain was coming from the hips, but he was unsure as to etiology.  He ordered an MRI to rule out avascular necrosis.

Mr. Hicks followed up with Dr. White on March 1, 2012.[13]  Dr. White noted that the MRI ordered by Dr. Clause failed to reveal any etiology for the hip pain. The claimant was using Lortab, a narcotic pain reliever, as necessary with minimal efficacy, and his complaints remained the same.  His problems included anxiety syndrome, insomnia, alcoholism, hip pain, elevated blood pressure, essential/familial tremor, Vitamin D deficiency, and abnormal liver.  Vitamin B3 was added to his medication regimen.

---

[12]     Rec. Doc. 12-1 at 288-289.

[13]     Rec. Doc. 12-1 at 241-244.

4

The claimant again saw Dr. White on March 23, 2012[14] to get the results of a lumbar spine CT scan, which showed[15] broad-based disc bulges from L3-4 through L5-S1 with moderate central spinal canal and lateral recess stenosis as well as a congenitally narrowed spinal canal. The CT scan also showed a small central disc protrusion at the L5-S1 level with disc material approximating the S1 nerve roots. Additionally, there was ligamentum flavum hypertrophy extending from L3-4 through L5-S1. Dr. White added lumbar disc disease and lumbar neuropathy to the claimant's problem list.

On April 12, 2012, Mr. Hicks consulted Dr. George Raymond Williams, an orthopaedic surgeon.[16] His chief complaints were back and right leg pain, and he also told Dr. Williams that he had hip pain radiating to above his right knee. Dr. Williams's assessments were lumbar back pain and lumbar spinal stenosis, and he prescribed Mobic, rest, ice and heat, and a stretching and strengthening program. He also referred the claimant to physical therapy.

On June 15, 2012, the claimant followed up with Dr. White,[17] reporting increased pain since starting physical therapy. His medication dosages were

---

[14]     Rec. Doc. 12-1 at 245-247.

[15]     Rec. Doc. 12-1 at 291-293.

[16]     Rec. Doc. 12-1 at 342-345. 394-398.

[17]     Rec. Doc. 12-1 at 251-253.

adjusted. His problem list included anxiety syndrome, essential/familial tremor, lumbar disc disease, and lumbar neuropathy.

When the claimant returned to Dr. Williams on July 24, 2012,[18] he reported that physical therapy had not relieved his pain. Dr. Williams recommended that he continue with conservative care and activities, and he recommended lumbar epidural steroid injections ("LESI"). A week later, on July 30, 2012, Dr. Williams administered the first LESI and he prescribed Percocet for pain.[19]

When Mr. Hicks saw Dr. Williams again on September 11, 2012,[20] he reported two to three weeks of relief from the LESI but a return of pain after that. Dr. Williams noted that the claimant had a normal gait, pain with palpation at the lower lumbar region, no visible atrophy, no triggers, no muscle spasms, limited flexion and rotation at the lumbar spine, pain with right hip internal rotation but negative straight leg raise tests. He diagnosed lumbar back pain, lumbar degenerative disc, lumbar spondylosis, and lumbar spinal stenosis. He prescribed Lortab and planned a repeat LESI. The claimant received a second LESI on September 24, 2012.[21]

---

[18]    Rec. Doc. 12-1 at 346-347.

[19]    Rec. Doc. 12-1 at 348-349.

[20]    Rec. Doc. 12-1 at 352-353.

[21]    Rec. Doc. 12-1 at 354-355.

On October 16, 2012,[22] the claimant told Dr. White that he had been awakened approximately a week earlier by pain in his left knee, ankle, wrist, and elbow, which was persisting in the left knee. His gait was described as slow and antalgic. He had a limited range of motion in both hips due to pain, mild crepitation in both knees, mild lumbar tenderness, and tremors. His problems included osteoarthritis in his knees, lumbar disc disease, and lumbar neuropathy. He was to follow up with Dr. Williams with regard to his back. A Kenalog-Lidocaine injection was planned for his left knee. Dr. White signed a form releasing him to return to work the next day.[23]

The claimant saw Dr. Williams again on November 6, 2012.[24] His condition was unchanged. He was taking Lortab, Percocet, Norco, Alprazolam, Mobic, and Pristiq. The plan was to repeat LESIs as needed.

The claimant returned to Dr. White on February 4, 2013,[25] reporting increased insomnia and depression following the recent death of his father. He had stopped taking Pristiq. He denied illusions, memory loss, and suicidal ideation. Cymbalta and Intermezzo were prescribed, and he was released to return to work the next day.[26]

---

[22]     Rec. Doc. 12-1 at 255-257.

[23]     Rec. Doc. 12-1 at 300.

[24]     Rec. Doc. 12-1 at 356-357.

[25]     Rec. Doc. 12-1 at 258-260.

[26]     Rec. Doc. 12-1 at 303.

Mr. Hicks saw Dr. Williams again on February 7, 2013.[27]  He reported that the effects of the LESI had worn off but he wanted to continue with conservative care.  His only new complaint was an increase in lower extremity muscle spasms. Flexeril was added to his medications.  The claimant saw Dr. Williams on February 18, 2013 for another LESI.[28]

The claimant's next appointment with Dr. White was on March 26, 2013.[29] He reported continued pain and muscle spasms although the muscle relaxant was helping a little.  He complained of having low energy, feeling disinterested, trouble concentrating, insomnia, and anxiety.  He stated that he was taking Cymbalta as prescribed.  The Cymbalta was discontinued, and Viibryd was started.  He was released to return to work the next day.[30]

The claimant saw Dr. White again on April 12, 2013[31] to get lab test results. Hypotestosteronemia (low testosterone) was added to his problem list, and he was prescribed AndroGel.

---

[27]    Rec. Doc. 12-1 at 358-360.

[28]    Rec. Doc. 12-1 at 361-362.

[29]    Rec. Doc. 12-1 at 262-264.

[30]    Rec. Doc. 12-1 at 307.

[31]    Rec. Doc. 12-1 at 265-268.

On May 21, 2013, the claimant returned to Dr. Williams.[32]    At all prior appointments with Dr. Williams, his gait had been described as not antalgic.  This time, however, the treatment note described his gait as antalgic.  Neurologic testing showed numbness on the right at L1-L5.  The plan was for the claimant to try chiropractic care and if that did not improve his symptoms, an MRI would be obtained, and an L4/S5 decompression and fusion would be considered.

On July 18, 2013, the claimant saw Dr. Williams, again complaining of back and right leg pain.[33]  Dr. Williams noted that his lower extremity symptoms were worsening.   The strength in his gastrocnemius and anterior tibial muscles had decreased, and he had numbness on the right correlating to lumbar nerves.  Dr. Williams noted that the claimant had failed all conservative care, and he ordered a repeat MRI of the lumbar spine, with a surgical recommendation to follow.

An MRI of the claimant's lumbar spine was obtained on July 23, 2013.[34]  It showed degenerative disc disease with mild annular bulging at T10-T11; degenerative disc disease at L3-L4 with mild annular bulging, a small right foraminal disc protrusion, and a right foraminal annular fissure abutting the right L3 nerve in the foramen; degenerative disc changes at L4-L5 with mild annular bulging

---

[32]    Rec. Doc. 12-1 at 363-364.

[33]    Rec. Doc. 12-1 at 365-367.

[34]    Rec. Doc. 12-1 at 480.

and a left foraminal annular fissure; mild annular bulging at L5-S1, and a congenitally narrow spinal canal.

The claimant saw Dr. White again on July 30, 2013,[35] complaining that he woke up due to bilateral leg pain four days earlier. A Vitamin B12 deficiency was added to his list of problems, and his medications were adjusted.

The claimant followed up with Dr. Williams on August 20, 2013,[36] and Dr. Williams recommended an L3-L5 posterior lumbar decompression and fusion. Mr. Hicks indicated, however, that he would like to postpone the procedure.

The claimant returned to Dr. Williams on December 10, 2013.[37] Dr. Williams observed him moving around the office with guarded movements, noted that his gait was antalgic, and noted that he complained of pain with palpation at the lower lumbar region. Flexion, rotation, and extension of his lumbar spine was limited. He had a positive sitting straight leg raising test. Strength remained reduced in the gastrocnemius and anterior tibial muscles, and neurological sensory testing showed numbness on the right at L1-L5. Dr. Williams noted that Mr. Hicks's pain was now radiating to both legs and he was having tingling in his lower digits. Due to the

---

[35]    Rec. Doc. 12-1 at 271-272, 317.

[36]    Rec. Doc. 12-1 at 368-370.

[37]    Rec. Doc. 12-1 at 371-373.

progression of the symptoms, the claimant agreed to schedule surgery for January 8, 2014.  Flexeril and Norco were prescribed.

The claimant had a preoperative evaluation with Dr. Williams on January 2, 2014.[38]  It was noted that he had a normal gait, no arm or leg length inequality, normal pulses, pain with palpation at the lower lumbar region, no visible atrophy, limited flexion and rotation of the lumbar spine, negative sitting and supine straight leg raise tests, slightly decreased strength in his quadriceps and anterior tibial muscles, as well as numbness on the right at L1-L5.  Informed consent for the surgery was obtained.

The claimant also saw Dr. White that same day.[39]  Dr. White found him to be at low risk for intra-operative complications and okayed him for the lumbar surgery.

On January 8, 2014, Dr. Williams performed a posterior lumbar interbody decompression and fusion at L3-L4-L5, and the claimant was released from the hospital on January 11, 2014.[40]

---

[38]     Rec. Doc. 12-1 at 374-377.

[39]     Rec. Doc. 12-1 at 273-276.

[40]     Rec. Doc. 12-1 at 210-213, 221-226, 403-406.

On January 27, 2014,[41] Mr. Hicks told Dr. Williams that he was experiencing uncontrolled muscle spasms not alleviated by medication. However, X-rays showed the instrumentation to be in a stable position. A different medication was prescribed.

The claimant followed up with Dr. Williams on February 20, 2014.[42] He was wearing a brace, he had mild soft tissue pain with palpation at the lower lumbar region, his scar had healed, his gait was normal, the range of motion in his lumbar spine was limited, and straight leg raise tests were negative. His muscle strength and neurological deficits had returned to normal. X-rays showed that the instrumentation appeared to be normal. Dr. Williams encouraged Mr. Hicks to walk but advised him to avoid bending, twisting, and lifting more than ten pounds.

Mr. Hicks saw Dr. Williams again on March 20, 2014.[43] The treatment note indicated that he moved around the office with a brace, slowly changed positions from seated to standing, had mild soft tissue pain with palpation at the lower lumbar region, and had limited range of motion in all planes of the lumbar spine. Dr. Williams also noted a mild increase in consolidation of the fusion. Mr. Hicks was kept on no work status but Dr. Williams indicated that this would be reevaluated at the next visit. Dr. Williams advised the claimant to engage in conservative activities

---

[41]    Rec. Doc. 12-1 at 378-379.

[42]    Rec. Doc. 12-1 at 380-381.

[43]    Rec. Doc. 12-1 at 382-384.

and light walking to facilitate his return to work.  However, he was to avoid bending, twisting, and lifting more than ten pounds.

The claimant saw Dr. White on April 15, 2014.[44]  His chief complaints were gastric bypass surgery, low testosterone, insomnia, and low back pain.  The diagnoses assigned were essential/familial tremor, Vitamin D deficiency, lumbar neuropathy, hypotestosteronemia, Vitamin B-12 deficiency, and low back surgery.  His medications were adjusted.

The claimant returned to Dr. Williams on April 24, 2014.[45]  His physical examination was normal except that the range of motion in his lumbar spine was limited.  He was advised to rest, apply ice and heat, follow home stretching and strengthening programs, go to physical therapy, and take his medications, which included two Norco dosages, Percocet, Soma, Zanaflex, Flexeril, and Mobic.

The claimant saw Dr. White on June 2, 2014.[46]  His chief complaints were a history of alcoholism, low back pain, low testosterone, anxiety, and pernicious anemia.  He was reportedly drinking much less.  He was prescribed Vitamin B-12.

---

[44]    Rec. Doc. 12-1 at 279-281.

[45]    Rec. Doc. 12-1 at 385-387.

[46]    Rec. Doc. 12-1 at 284-286.

The claimant saw Dr. Williams again on June 5, 2014.[47]  He complained of intermittent weakness in his right leg and multiple falls.  His lumbar pain was tolerable with pain medication.  Dr. Williams noticed his tremor, and the claimant explained that it had worsened over the previous eighteen months.  Dr. Williams recommended an MRI of the lumbar spine and referred the claimant to a neurologist for evaluation of his tremor.

An MRI of the claimant's lumbar spine, obtained on June 12, 2014,[48] showed postoperative changes with bilateral pedicle screws at the L3, L4, and L5 levels without a definite recurrent disc protrusion or herniation at those levels.  It also showed minimal broad-based disc bulges at the L3-4, L4-5, and L5-S1 levels, minimally indenting the ventral thecal sac.

On June 19, 2014, Mr. Hicks returned to Dr. Williams,[49] with primary complaints of right lower extremity weakness, tremors, and involuntary falls.  Dr. Williams noted an obvious tremor of the claimant's left arm and weakness in the right quadriceps muscle.  The only medications he prescribed were Xanax and Percocet.  Dr. Williams recommended brain and cervical spine MRIs, and he was awaiting a neurological evaluation.

---

[47]    Rec. Doc. 12-1 at 388-390.

[48]    Rec. Doc. 12-1 at 479.

[49]    Rec. Doc. 12-1 at 391-393.

14

An MRI of the cervical spine obtained on June 24, 2014[50] showed minimal broad-based disc bulges extending from the C3-4 through the C6-7 levels, minimally indenting the ventral thecal sac without significant central spinal canal or neural foraminal stenosis.  An MRI of the brain, obtained the same date, was normal except for extremely minimal chronic bilateral maxillary and ethmoid sinusitis.[51]

On June 30, 2014, the claimant saw a neurologist, Dr. Adam Foreman at Lafayette General Neuroscience Center of Acadiana.[52]   His chief complaint was tremors, and he told Dr. Foreman that his mother had tremors similar to his.  He explained that his left hand and his head shake, some days worse than others. Sometimes he had difficulty brushing his teeth.  He also complained about losing his balance due to numbness in his right leg.  Dr. Foreman's impressions were essential tremor, cervical dystonia, and right lower extremity lumbar radiculopathy. He prescribed Primidone 50, was considering Botox, and recommended an EMG. On a subsequent undated visit,[53] the claimant reported falling as frequently as once per day.  Dr. Foreman increased his Primidone dosage and prescribed Neurontin for his lumbar radiculopathy.

---

[50]     Rec. Doc. 12-1 at 477.

[51]     Rec. Doc. 12-1 at 478.

[52]     Rec. Doc. 12-1 at 553-554.

[53]     Rec. Doc. 12-1 at 411-414.

The claimant returned to Dr. Williams on July 15, 2014,[54] reporting that his leg was giving out and he was falling.  He moved about the office with a normal gait, he had pain with palpation at the lower lumbar region, and testing showed numbness at the L4-5 region.

On August 27, 2014, the claimant had an EMG/nerve conduction study with Dr. David L. Weir of the Lafayette General Neuroscience Center of Acadiana.[55]  He told Dr. Weir that he injured his back in the military in 1990 and that his low back pain had worsened over the previous four years, with the pain radiating into his right leg and right groin and down to the right foot on the lateral portion of the leg.  He reported that, following decompression surgery at L3-L5, he continued to have low back pain radiating to the right groin and into his right lateral leg into the foot along with decreased sensation in the entire right leg.  He also told Dr. Weir that his leg occasionally gave way.  Upon examination, the claimant had a positive extended leg raise test on the right leg, there was decreased sensation to pinprick in the entire right leg, there was a slight decrease in strength of dorsiflexion and plantar flexion of the right foot, and he had an action tremor of his hand.  The study showed chronic right L4-S1 radiculopathy that, according to Dr. Weir, might have resulted from long-standing nerve root compression prior to surgery.

---

[54]    Rec. Doc. 12-1 at 421-422.

[55]    Rec. Doc. 12-1 at 547-548.

On September 2, 2014, the claimant again saw Dr. Williams.[56]  His symptoms were unchanged but he was observed moving around the office with guarded changes of position.  Dr. Williams recommended continued conservative activities, and he prescribed Neurontin.

On September 3, 2014, the claimant was evaluated by Dr. Sandra B. Durdin, a clinical psychologist.[57]  He explained to her that he injured his back during basic training in the military when he fell out of a tower, and the resulting pain progressively worsened over the years.  He received psychiatric treatment in 2000 due to marital issues and issues with his weight.  He had gastric bypass surgery in 2004 and kept the weight off thereafter.  He reportedly drank heavily for two years but now only drinks socially.  He had inpatient treatment for alcohol abuse and depression.  Dr. Durdin observed that his gait and posture were normal.  She stated that his focus was on his physical condition and the things that he can no longer do rather than on his mental status.  She diagnosed persistent depressive disorder, dysthymia, mild to moderate; alcohol use disorder, allegedly controlled; and partner relational problems, reportedly resolved.  His mental status examination was normal.  Dr. Durdin opined that Mr. Hicks is able to understand and carry out simple instructions as well as familiar detailed instructions, that he can sustain attention and

---

[56]    Rec. Doc. 12-1 at 423-424.

[57]    Rec. Doc. 12-1 at 433-435.

17

concentration for two hour blocks of time, that he can get along with others, that he can sustain over a forty-hour work week from a mental perspective with adequate symptom control; and that he can withstand low to medium demand tasks although his pain could be a factor in tolerating high demand tasks.  In Dr. Durdin's opinion, Mr. Hicks's adaptive functioning was not impaired by mental issues.  She did not opine on his physical impairments but recommended that his physical capacity for work should be determined.

The claimant saw Dr. White again on September 16, 2014 in follow up for multiple problems including depression, alcoholism, chronic pain syndrome, lumbar neuropathy, and pernicious anemia.[58]  Having been told that his neuropathy was permanent, Mr. Hicks was more depressed and drinking more.  Dr. White prescribed Cymbalta and Primidone and advised Mr. Hicks to avoid excessive bending, lifting, and stooping.

On October 21, 2014, Dr. White prescribed a cane for Mr. Hicks, noting that he had been diagnosed with polyneuropathy and that his mobility was impaired.[59] On that same date, Dr. White signed a "Medical Examiner's Certificate of Mobility

---

[58]    Rec. Doc. 12-1 at 523-525.

[59]    Rec. Doc. 12-1 at 439.

Impairment" required by the Office of Motor Vehicles for a mobility-impaired license plate or hang-tag.[60]

The claimant followed up with Dr. White on November 5, 2014[61] regarding multiple conditions. Due to recurrent falls, he was using the prescribed cane for mobility. The dosage of Vitamin D3 was increased, and the claimant was to follow up with his neurologist and orthopedist.

On March 5, 2015, Mr. Hicks again saw Dr. White.[62] His problems were listed as depression, essential/familial tremor, weight loss, Vitamin D deficiency, hypotestosteronemia, history of bariatric surgery, history of low back surgery, and Eustachian tube dysfunction. He was prescribed Oxycodone-Acetaminophen in a lower dose, Testosterone Cypionate, and folic acid. His AndroGel prescription was discontinued because he had stopped taking it due to the cost, and his Vitamin B-12 injections were discontinued due to completion of therapy.

The claimant returned to Dr. White on April 2, 2015.[63] His chief complaints were weight loss, history of gastric bypass surgery, cough, and depression. He complained of being tearful, having low energy, trouble concentrating, and trouble

---

[60]    Rec. Doc. 12-1 at 535.

[61]    Rec. Doc. 12-1 at 516-520.

[62]    Rec. Doc. 12-1 at 506-509.

[63]    Rec. Doc. 12-1 at 500-503.

sleeping.  He was diagnosed with acute bronchitis and prescribed Mirtazapine for depression in place of Cymbalta.

On May 5, 2015,[64] Mr. Hicks again saw Dr. White.  He reported that he was drinking less beer, his energy level had improved, and his appetite had improved.  A moderate head tremor was noted.

On June 5, 2015, the claimant saw neurologist Dr. Rebecca Whiddon[65] upon referral from Dr. Foreman for evaluation of dystonia (a movement disorder characterized by involuntary muscle contractions).  She did not mention the claimant using a cane.  She noted that the claimant's mother has multiple sclerosis and his grandfather had Parkinson's disease.  Mr. Hicks complained of blurred vision, back pain, muscle cramps, muscle weakness, tingling, numbness, tremors, frequent falls, difficulty walking, depression, and anxiety.  His tandem gait was normal.  Dr. Whiddon observed mild tremulousness of the head, mild postural tremulousness, and kinetic tremor in his left hand.  He had no rigidity.  His handwriting was not micrographic or tremulous.  His right arm swing was absent while walking.  He stood with his right shoulder higher than his left shoulder and his right foot turned out.  Dr. Whiddon found that the claimant's history and examination were consistent with segmental dystonia involving the neck and upper extremities asymmetrically.  She

---

[64]    Rec. Doc. 12-1 at 494-497.

[65]    Rec. Doc. 12-1 at 468-474.

ordered trials of Levodopa and Clonazepam.  She was not convinced that Mr. Hicks had Parkinson's disease.  She doubted that the vision problem was related and referred the claimant to an ophthalmologist.  She also ordered laboratory testing.

The claimant returned to Dr. White on July 2, 2015.[66]  His problem list was limited to hypomagnesemia, tremor, and dystonia, and Dr. White prescribed a magnesium supplement.

The claimant followed up with Dr. Whiddon on August 17, 2015.[67]  He reported that neither Levodopa nor Clonazepam had helped his symptoms.  He also reported that his brother had begun developing similar symptoms.  She prescribed Trihexyphenidyl HCL, an antispasmodic medication, and ordered a diagnostic test called a DaTscan.  The claimant was to stop taking Clonazepam and try tapering off Primidone.

On August 24, 2015, Dr. Williams filled out a "Physical Residual Functional Capacity Questionnaire."[68]  In his opinion, the claimant was permanently disabled and unable to return to work.  He opined that the claimant had an unsteady gait and permanent neurological deficits.  He estimated that the claimant could not walk without either rest or severe pain, could sit or stand for only five minutes without

---

[66]     Rec. Doc. 12-1 at 489-491.

[67]     Rec. Doc. 12-1 at 462-467.

[68]     Rec. Doc. 12-1 at 483-486.

having to change position, could sit and stand/walk for less than thirty minutes in an eight-hour work day, would need to take unscheduled breaks while at work, and would need to elevate his legs during the work day.  Dr. Williams noted that the claimant must use a cane and should lift less than five pounds.  He opined that the claimant could occasionally look down, turn his head to left or right, look up or hold his head in a static position.  He opined that the claimant could never stoop, crouch/squat, or climb ladders, could rarely twist with assistance, and could never climb stairs with assistance.  Dr. Williams opined that, because of his unsteady gait, the claimant would have significant limitations with reaching, handling, or fingering and should not engage in work requiring those activities.

On August 3, 2016, the claimant was examined by Dr. Charles E. Kaufman, a neurologist, for an independent medical evaluation.[69]  The claimant told Dr. Kaufman that the surgery did not cure his back pain and that his right leg pain worsened after surgery.  He had also developed numbness and tingling in the leg. His knee would give way causing him to fall, and he used a cane.  He stated that he had a mild tremor for most of his life that had worsened over the preceding two years.  He did not have the DaTscan ordered by Dr. Whiddon because he could not afford it.  His maternal grandfather had Parkinson's disease, and his mother has MS.

---

[69]     Rec. Doc. 12-1 at 22-26.

He is followed by his primary care physician regarding his bariatric surgery.  He reported degenerative joint disease in his knees and problems with his right hip that required surgery.  He reported that his brother had begun having tremors.  He reported only occasionally drinking beer.  Dr. Kaufman's examination detected mild bradykinesia or slowness of movement typically associated with Parkinson's disease.  He detected greater muscle tone in the left arm than in the right arm.  He observed a definite head tremor and a postural tremor of his arms, left arm greater than right, which affected Mr. Hicks's penmanship.  The claimant's gait was "clearly antalgic," and he used a cane.  Dr. Kaufman concluded that there was evidence of a neurological disorder that might be Parkinson's disease or a Parkinson's plus syndrome.  It was his further opinion that there was not much that the claimant was able to do from a physical standpoint, leaving him totally disabled.  He found that the claimant has a chronic progressive degenerative neurologic disorder.

On February 18, 2016, the claimant testified at a hearing regarding his symptoms, impairments, and medical treatment.  He explained that he did not return to work following lumbar surgery in January 2014.  Most days, he watched television.  Sometimes he drove to the post office but, because he has problems with his right leg giving out, he does not like to drive very far.  He has horses and dogs but is no longer able to take care of them.  He reads the news on the internet and shops on craigslist.  Occasionally, he and his wife host family functions and they go

out to dinner "every now and then." He remained under the care of Dr. White, Dr. Williams, and a neurologist. Mr. Hicks explained that his back hurts all the time, causing him to constantly change positions. He said that he spends about four to five hours per day laying down. Because he cannot bend over, he has a device to help pull up his socks and uses a long shoe horn to put on his shoes. Sometimes his wife has to tie his shoes for him. He stated that the pain radiates down his right leg, and he also experiences numbness in his leg. He said that walking intensifies the pain in his back, hip, and down his leg. He uses a cane when walking to keep as much pressure as possible off his right leg and stated that he cannot walk long enough to grocery shop. He stated that he has fallen numerous times because his leg gave out. For that reason, he sits down while taking a shower. He uses a heating pad and takes medication for the pain. He has to elevate his leg at night when he sleeps. Although he testified that he is on pain management, there were no treatment notes in the record from a pain management specialist. He also stated that his pain medication makes him sleepy.

Mr. Hicks also explained that he has head and hand tremors. His wife has to load his toothbrush for him, and he sometimes has trouble holding a cup. He cooks only to quickly microwave something. He does not do laundry, clean house, or do yard work. Instead, his sister-in-law comes twice a week to help out in the house and he has others assist with his horses. He can no longer ride or care for his horses.

24

He can no longer fish.  He estimated that he can sit or stand for only about five to ten minutes before having to change positions or stretch out.  He estimated that he could only walk for about thirty to forty yards.  He stated that he no longer abuses alcohol, drinking only one or two beers once or twice a week.

## Analysis

### A.    Standard of Review

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the proper legal standards were used in evaluating the evidence.[70]  "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[71]  Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[72]

---

[70]    *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

[71]    *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

[72]    *Hames v. Heckler*, 707 F.2d at 164 (citations omitted).

If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.[73]  In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from re-weighing the evidence or substituting its judgment for that of the Commissioner.[74]  Conflicts in the evidence[75] and credibility assessments[76] are for the Commissioner to resolve, not the courts.  Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination:  (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience.[77]

## B.    <u>Entitlement to Benefits</u>

The Disability Insurance Benefit ("DIB") program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence.[78]  A person is disabled "if he is

---

[73]    42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173.

[74]    *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1022.

[75]    *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).

[76]    *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991).

[77]    *Wren v. Sullivan*, 925 F.2d at 126.

[78]    See 42 U.S.C. § 423(a).

26

unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[79]  A claimant is disabled only if his physical or mental impairment or impairments are so severe that he is unable to not only do his previous work, but cannot, considering his age, education, and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work.[80]

## C.    <u>Evaluation Process and Burden of Proof</u>

The Commissioner uses a sequential five-step process to determine whether a claimant is disabled, analyzing whether the claimant (1) is currently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) is able to do the kind of work he did in the past; and (5) can perform any other work.[81]

---

[79]    42 U.S.C. § 1382c(a)(3)(A).

[80]    42 U.S.C. § 1382c(a)(3)(B).

[81]    20 C.F.R. § 404.1520.

Before going from step three to step four, the Commissioner assesses the claimant's residual functional capacity[82] by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the record.[83]  The claimant's residual functional capacity is used at the fourth step to determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work.[84]

The claimant bears the burden of proof on the first four steps; at the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy.[85]  This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence.[86]  If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to

---

[82]    20 C.F.R. § 404.1520(a)(4).

[83]    20 C.F.R. § 404.1545(a)(1).

[84]    20 C.F.R. § 404.1520(e).

[85]    *Graves v. Colvin*, 837 F.3d 589, 592 (5th Cir. 2016); *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

[86]    *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

rebut this finding.[87]  "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis."[88]

## D.    **The ALJ's Findings and Conclusions**

In this case, the ALJ determined, at step one, that Mr. Hicks has not engaged in substantial gainful activity since January 8, 2014.  This finding is supported by substantial evidence in the record.

At step two, the ALJ found that Mr. Hicks has the following severe impairments:  posterior lumbar interbody fusion ("PLIF"), disorders of the back, torsion dystonia, depressive disorder, and a reportedly controlled alcohol use disorder.  This finding is supported by substantial evidence in the record.

At step three, the ALJ found that the claimant has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment.  The claimant challenged this finding.

The ALJ found that the claimant has the residual functional capacity to perform sedentary work except that he can only occasionally crawl, crouch, kneel, stoop, balance, and climb ramps and stairs to the extent they exist in sedentary work.  Additionally, he must avoid hazards such as heights and dangerous machinery, and

---

[87]    *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Fraga v. Bowen*, 810 F.2d at 1302.

[88]    *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

he is limited to frequent handling and fingering; repetitive, routine kinds of tasks; and work that does not require fast paced production or rigid quotas. The claimant challenged this finding.

At step four, the ALJ found that the claimant is not capable of performing any past relevant work. The claimant did not challenge this finding.

At step five, the ALJ found that Mr. Hicks was not disabled from January 8, 2014 through March 8, 2016 (the date of the decision) because there are jobs in the national economy that he can perform. The claimant challenged this finding.

## E.    **The Allegations of Error**

The claimant contended that the ALJ erred (1) in finding that he does not have an impairment that meets or equals the criteria of a listed impairment; (2) by improperly rejecting the opinions of his treating physician; (3) by failing to account for his need to use a prescribed cane; (4) by finding that he is capable of frequent handling and fingering; and (5) by failing to include all of his limitations in hypothetical questions asked of the vocational expert at the hearing.

## F.    **Do the Claimant's Impairments Meet or Equal a Listing?**

The claimant alleged that he had both mental and physical impairments that precluded him from working, and the ALJ concluded that his impairments "do not meet the criteria of any relevant listed impairment described in Appendix 1 of the

regulations."[89]  In deciding that the claimant did not have a mental impairment that met or equaled a listing, the ALJ reviewed the criteria for Listing 12.04 – depressive, bipolar, and related disorders – and those for Listing 12.09 – substance addiction disorders.  But the ALJ reached the same conclusion with regard to the claimant's physical impairments without identifying the listings that he considered and without any comparison of the claimant's symptoms or clinical findings with the criteria of any listing.  "[T]he ALJ is required to discuss the evidence and explain the basis for his findings at each unfavorable step of the sequential evaluation process."[90]  More particularly, "[t]he ALJ should identify the listed impairment for which the claimant's symptoms fail to qualify and provide an explanation as to how he or she determined that the symptoms are insufficiently severe to meet any listed impairment."[91]  Accordingly, the ALJ's analysis at step three was incomplete.

In *Audler v. Astrue*, the ALJ concluded that the medical evidence in the record indicated that the claimant had impairments that were severe but not severe enough to meet or medically equal a listed impairment.  The Fifth Circuit Court of Appeals noted that "[t]he ALJ did not identify the listed impairment for which Audler's

---

[89]    Rec. Doc. 12-1 at 32.

[90]    *Williams v. Astrue*, No. 09-0130, 2010 WL 989216, at * 3 (W.D. La. Mar. 15, 2010), citing *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007), which in turn cites 42 U.S.C. § 405(b)(1).

[91]    *Savoie v. Colvin*, No. 14-30-JJB-RLB, 2015 WL 1004217, at *5 (M.D. La. Mar. 5, 2015).

symptoms fail to qualify, nor did she provide any explanation as to how she reached the conclusion that Audler's symptoms are insufficiently severe to meet any listed impairment."[92]  The Fifth Circuit concluded that "[s]uch a bare conclusion is beyond meaningful judicial review."[93]  The court then went on to explain that:

> By the explicit terms of the statute [42 U.S.C. § 405(b)(1)], the ALJ was required to discuss the evidence offered in support of Audler's claim for disability and to explain why she found Audler not to be disabled at that step.  Although the ALJ is not always required to do an exhaustive point-by-point discussion, in this case, the ALJ offered nothing to support her conclusion at this step and because she did not, "we, as a reviewing court, simply cannot tell whether her decision is based on substantial evidence or not."[94]

In this case, as in *Audler*, the ALJ failed to follow the Fifth Circuit's guidelines for evaluating the claimant's impairments, summarily stating only that "Hicks did not have a physical impairment or combination of impairments that met or medically equaled the severity of an Appendix 1 listed impairment."[95]  Therefore, the record contains no indication that the ALJ actually considered the criteria of any listed impairments in reaching that conclusion.  More particularly, there is no evidence that

---

[92]    *Audler v. Astrue*, 501 F.3d at 448.

[93]    *Audler v. Astrue,* 501 F.3d at 448, quoting *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996).

[94]    *Audler v. Astrue*, 501 F.3d at 448, quoting *Cook v. Heckler*, 783 F.2d 1168, 1172 (4th Cir. 1986).

[95]    Rec. Doc. 15 at 13.

the ALJ actually considered whether the claimant has an impairment that meets the criteria of Listing 1.04 – disorders of the spine.

In accordance with the Fifth Circuit's reasoning, the Commissioner's step three determination in this case was not reached through the application of proper legal standards, and the undersigned is unable to determine whether the Commissioner's conclusion at step three is based on substantial evidence in the record.  Because the ALJ failed to compare the claimant's symptoms with those of any listings that might be relevant, remand is necessary.[96]  Therefore, the undersigned recommends that this matter should be remanded for a thorough analysis of whether the claimant has a physical impairment or any combination of physical impairments that meets or medically equals a listed impairment.

To be clear, the issue is not merely whether the claimant meets the criteria of a listed impairment but also whether his impairments, singly or in combination, medically equal the criteria of a listing.  There is no evidence in the ALJ's ruling indicating that he considered whether the claimant's severe impairments, when

---

[96]    See, e.g., *Reyna v. Colvin*, No. 5:14-CV-147-C, 2015 WL 1515251, at *4 (N.D. Tex. Apr. 1, 2015); *Marsh v. Comm'r of Soc. Sec. Admin.*, No. 4:13CV312, 2015 WL 1288656, at *3 (E.D. Tex. Mar. 20, 2015) *Watson v. Colvin*, No. 3:13-CV-583-BF, 2014 WL 1281473, at *4 (N.D. Tex. Mar. 31, 2014); *Joseph v. Astrue*, No. 6:10-CV-01315, 2012 WL 601477, at *6 n. 74 (W.D. La. Jan. 24, 2012) report and recommendation adopted, No. 6:10-CV-01315, 2012 WL 601586 (W.D. La. Feb. 22, 2012); *Robertson v. Astrue*, No. 3-10-CV-1669-BD, 2011 WL 3836915, at *4 (N.D. Tex. Aug. 26, 2011); *Lynch v. Astrue*, No. 7–10–CV–0032–BD, 2011 WL 1542056 at *3–4 (N.D.Tex. Apr.22, 2011).

combined, result in an impairment that is equivalent to those of any listed impairment, whether Listing 1.04, Listing 12.04, Listing 12.09, or any other relevant listing.  Accordingly, this matter should be remanded for further consideration.

## G.    Did the ALJ Improperly Reject the Treating Physician's Opinions?

Dr. Williams is the claimant's treating physician, and on August 24, 2015, he opined that the claimant was permanently disabled and unable to return to work.[97] In support of those ultimate opinions, Dr. Williams opined with greater particularity as to the claimant's abilities in several categories.  For example, he opined that the claimant can stand for only about five minutes without having to sit down, walk around, or otherwise change position; he opined that the claimant could sit and stand/walk for less than thirty minutes in and eight-hour work day; and he opined that the claimant could never lift or carry more than five pounds.  The claimant contended that the ALJ erred in failing to give controlling weight to Dr. Williams's opinions concerning his functionality.

The Social Security Administration published a new rule, applicable to claims filed on or after March 27, 2017, which eliminated the rule that treating sources be given controlling weight.[98]  But because Mr. Hicks filed his claim before March 27,

---

[97]    Rec. Doc. 12-1 at 483-486.

[98]    See 20 C.F.R. § 404.1520c.

2017, the pre-amendment version of the rule applies here.[99]  The applicable rule explains how medical opinions are to be weighed.[100]  The ALJ must evaluate all of the evidence in the case and determine the extent to which medical source opinions are supported by the record.  A treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with. . . other substantial evidence."[101]  However, "the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion."[102]  When rejecting the medical opinion of a treating physician, the ALJ must provide an explanation supported by good cause.[103]  Even when a treating physician's medical opinions are not given controlling weight, the statute requires that they must be weighed in light of the length of treatment, nature and extent of treatment, supportability, consistency, specialization, and any other relevant factors.

---

[99]      See 20 C.F.R. § 404.1527 ("For claims filed. . . before March 27, 2017, the rules in this section apply.  For claims filed on or after March 27, 2017, the rules in § 404.1520c apply.").

[100]     20 C.F.R. § 404.1527(c), § 416.927(c), SSR 96-2p, SSR 96-5p.

[101]     20 C.F.R. § 404.1527(d)(2).

[102]     *Martinez v. Chater*, 64 F.3d at 175-76 (quoting *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987)).

[103]     See *Loza v. Apfel*, 219 F.3d 378, 395 (5th Cir. 2000).

In this case, Dr. Williams's opinion that the claimant cannot perform any work was properly discounted by the ALJ because the ALJ has sole responsibility for determining the claimant's disability status.[104]    However, in making that determination, the ALJ must be guided by the evidence in the record.  If an ALJ declines to give controlling weight to a treating doctor's opinion, he may give the opinion little or no weight – but only after showing good cause for doing so.[105]  Good cause may be shown if the treating physician's opinion is conclusory, unsupported by medically acceptable clinical laboratory diagnostic techniques, or is otherwise unsupported by the evidence.[106]  The ALJ stated that he gave Dr. Williams's opinions little weight because almost a year had elapsed between Mr. Hicks's last visit with Dr. Williams and the date of Dr. Williams's medical source statement.[107]  But the ALJ gave significant weight to the opinions of Dr. Tony Honigman, a state agency medical consultant who never examined Mr. Hicks.  That distinction is illogical.  The ALJ also stated that Dr. Honigman's functionality opinions were "consistent with the evidence."[108]  However, the ALJ did not state what evidence in

---

[104]    *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000).

[105]    *Thibodeaux v. Astrue*, 324 Fed. App'x 440, 443-444 (5th Cir. 2009).

[106]    *Thibodeaux v. Astrue*, 324 Fed. App'x at 443-444.

[107]    Rec. Doc. 12-1 at 38.

[108]    Rec. Doc. 12-1 at 37.

the record was consistent with Dr. Honigman's opinions, and his opinions actually are not actually supported by substantial evidence in the record.  For example, Dr. Honigman opined that Mr. Hicks could occasionally lift and carry a maximum of twenty pounds, and frequently lift and carry a maximum of ten pounds.  But following surgery, Dr. Williams limited Mr. Hicks to never carrying more than ten pounds, and there is no evidence that this restriction was ever lifted.

In assigning little weight to Dr. Williams's opinions, the ALJ disregarded Dr. Williams's lengthy treatment history with the claimant and his area of specialization. This was error.  This Court finds that, in weighing the opinions of the various medical sources, the ALJ applied an improper legal standard by placing undue reliance on a non-examining source, which led to findings on residual functional capacity and disability that are not supported by substantial evidence.  This Court further finds that the ALJ should have either given controlling weight to the opinions of Dr. Williams or fully and completely explained why it was not appropriate to do so. Accordingly, this Court recommends that this matter be remanded for a proper weighing of medical opinions, another evaluation of Mr. Hicks's residual functional capacity, and another decision concerning his alleged disability.

## H.    **Did the ALJ Consider the Claimant's Cane?**

The ALJ relied upon evidence provided by a vocational expert in determining that there are jobs in significant numbers in the national economy that Mr. Hicks can

perform.   Although Dr. White prescribed a cane for Mr. Hicks, and Mr. Hicks

explained at the hearing precisely why the cane is necessary, none of the hypothetical

questions presented to the vocational expert at the hearing took into account that a

cane was necessary for his effective ambulation.   The Social Security regulations

recognize that the use of a cane might, in certain circumstances, erode the number

of sedentary jobs available,[109] and the Fifth Circuit requires the ALJ to ask

hypothetical questions that reasonably incorporate all of a claimant's disabilities.

> Unless the hypothetical question posed to the vocational expert by the
> ALJ can be said to incorporate reasonably all disabilities of the claimant
> recognized by the ALJ, and the claimant or his representative is
> afforded the opportunity to correct deficiencies in the ALJ's question
> by mentioning or suggesting to the vocational expert any purported
> defects in the hypothetical questions (including additional disabilities
> not recognized by the ALJ's findings and disabilities recognized but
> omitted from the question), a determination of non-disability based on
> such a defective question cannot stand.[110]

Therefore, the ALJ erred in failing to include the necessity for a cane in the

hypothetical questions that he posed to the vocational expert.   But the error was not

prejudicial because the claimant was represented at the hearing, and his

representative was afforded an opportunity to cure the ALJ's error by asking

questions on his behalf.   Although the claimant's representative did pose questions

to the vocational expert, he too failed to ask about Mr. Hick's use of a cane.

---

[109]    SSR 96-9p, 1996 WL 374185 at *7.

[110]    *Bowling v. Shalala*, 36 F.3d at 436.

A party's failure to point out the problems in a defective hypothetical does not "automatically salvage[] that hypothetical as a proper basis for a determination of non-disability."[111]    In this case, however, Mr. Hick's representative had a fair opportunity to correct the deficiency in the hypothetical questions that resulted from the ALJ's failure to mention Mr. Hicks's cane.  Accordingly, the claimant was not prejudiced by the ALJ's omission of Mr. Hicks's use of a cane, and the ALJ's error was harmless.

## I.    <u>Is the Claimant Capable of Frequent Handling and Fingering</u>?

Mr. Hicks argued that the ALJ erred in finding him capable of frequent handling and fingering.  It is undisputed that Mr. Hicks experiences tremors of his head and hands, and he has been diagnosed with torsion dystonia.  However, the ALJ found that, despite the tremors and the diagnosis, he remains capable of frequent handling and fingering.  Under the Social Security regulations, the term "frequent" means a minimum of one-third of the time to a maximum of two-thirds of the time.[112] Based on an eight-hour workday, frequent handling or fingering would occupy between slightly more than two and a half hours to about five hours and twenty minutes of each workday.  The ALJ acknowledged that Mr. Hicks has hand tremors but noted that the tremors do not prevent him from driving, using the internet, or

---

[111]    *Boyd v. Apfel*, 239 F.3d 698, 707 (5th Cir. 2001).

[112]    SSR 83-10.

hosting family functions in his home; he also noted that Dr. Whiddon found that the claimant's handwriting was neither micrographic nor tremulous.  Accordingly, there was substantial evidence in the record supporting the ALJ's conclusion that Mr. Hicks is capable of frequent handling and fingering.  Therefore, this assignment of error lacks merit.

**J.**     **<u>Were the Hypothetical Questions Fully Inclusive</u>?**

Mr. Hicks complained that the ALJ erred in posing a hypothetical question to the vocational expert regarding "only occasional postural activities" without specifying that the ALJ was referring to his finding that the claimant could "occasionally crawl, kneel, stoop, balance, and climb ramps and stairs."  The Social Security regulations define the term "postural limitations" as "related to such activities as climbing ladders, ropes, or scaffolds, balancing, kneeling, crouching, or crawling."[113]  Accordingly, this Court finds that the ALJ and the vocational expert both understood the ALJ's reference to "postural limitations" to be a reference to crawling, kneeling, stooping, balancing, and climbing ramps and stairs and further finds that this argument lacks merit.

---

[113]     SSR 96-9p, 1996 WL 374185, at *7.

## Conclusion and Recommendation

For the foregoing reasons, this Court recommends that the Commissioner's decision be REVERSED and REMANDED to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) with instructions to thoroughly analyze whether the claimant has a physical impairment or any combination of physical impairments that meets or medically equals a listed impairment, to properly weigh the medical opinions, to evaluate Mr. Hicks's residual functional capacity, and to determine whether Mr. Hick is disabled.  Inasmuch as the reversal and remand recommended herein falls under sentence four of Section 405(g), any judgment entered in connection herewith will be a "final judgment" for purposes of the Equal Access to Justice Act (EAJA).[114]

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen days after receipt of a copy of any objections or responses to the district judge at the time of filing.

---

[114]    See, *Richard v. Sullivan*, 955 F.2d 354 (5th Cir. 1992), and *Shalala v. Schaefer*, 509 U.S. 292 (1993).

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.[115]

Signed in Lafayette, Louisiana, this 1st day of November 2018.

_____
PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE

---

[115]    See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).